# EXHIBIT 1

IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

2000 L Owner L.L.C.,
15 East 26th Street
New York, NY 10010

                    Plaintiff,

        v.                                        Civil Action No. _____

Universal Service Administrative Company
2000 L Street, NW Washington, DC 20036

                    Defendant.

**COMPLAINT FOR DECLARATORY JUDGMENT,
DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff, for its complaint against Defendant, alleges as follows:

**SUMMARY**

1.      This is an action for declaratory judgment and injunctive relief to allow 2000 L Owner

L.L.C. ("2000 L") access to the portion of its building located at 2000 L Street, Washington, DC

(the "Premises") currently leased to Universal Service Administrative Company ("USAC"), for

the purpose of conducting renovations.

**JURISDICTION AND VENUE**

2.      The Court has jurisdiction under D.C. Code § 11-921.

3.      The Court has personal jurisdiction over Defendant under D.C. Code § 13-423.

4.      Venue is proper in the District of Columbia ("DC") because the property is located in DC

and all relevant actions forming the basis of the claims asserted occurred principally within DC.

**PARTIES**

5.      Plaintiff is a New York limited liability corporation with its principal place of business at 15 East 26th Street, New York, NY 10010.

6.      Plaintiff is the fee owner of the real property located at 2000 L Street, NW Washington, DC 20036 ("the Building").   2000 L, as successor in interest to 2000 L Co., LLC, formerly known as TrizecHahn 2000 L Street, is the landlord (the "Landlord") of the Building.

7.      Defendant is a Delaware corporation with its principal place of business located at 2000 L Street, NW Washington, DC 20036.

8.      Defendant is a tenant ("Tenant") in the Building.

**FACTS**

**The 2003 Lease**

9.      On or about July 9, 2003, Landlord's (Plaintiff's) predecessor-in-interest and Tenant (Defendant) entered into an Office Lease (the "Original Lease") under which Tenant leased 28,891 square feet of office space on the second floor of the Building.  *See* Ex A, Original Lease pp. 1-3.

10.     The Original Lease was subsequently amended eight times to expand the leased space and to reflect agreed upon modifications to the terms.   The Original Lease, as amended, is hereinafter referred to as the "Lease".  *See* Exs. 1-8.

11.     Section 11 of the Original Lease states:

> **Landlord's access to premises:** Upon such notice as is reasonable under the circumstances, which notice may be given orally, and which notice shall not be required in the event of an emergency, Landlord may at any reasonable time enter the Premises to examine them, to make alterations or repairs thereto or for any other purposes which Landlord considers necessary or advisable. . . . Landlord reserves the right and shall be permitted reasonable access to the Premises to install facilities within and through the Premises and to install and service any

systems deemed advisable by Landlord to provide services or utilities to any tenant of the Building.

Ex. A § 11.

12.     In addition, Landlord reserves certain rights in Section 30 of the Original Lease, including the right to:

> . . . decorate and make repairs, alterations, additions, and improvements, whether structural or otherwise, in, to and about the Building and any part thereof, *and for such purposes to enter the Premises*, and, during the continuance of any such work, to close temporarily doors, entry ways, Common Areas in the Building and to interrupt or temporarily suspend Building services and facilities, all without affecting Tenant's obligations hereunder, as long as the Premises remain tenantable for the conduct of Tenant's business therein and Tenant shall have reasonable access to the Premises.

Ex. A. § 30(D) (emphasis added).

13.     Section 27 of the Original Lease provides Tenant a covenant of quiet enjoyment, but expressly makes such covenant "subject to the provisions of this Lease."  Ex. A § 27.

14.     Section 27 of the Original Lease also provides that Tenant shall have the right to quiet enjoyment only if "Tenant shall pay all Rent and perform all of Tenant's other obligations under this Lease."  Ex. A § 27.

**The Parties Enter into the Seventh Amendment of the Lease
Which Addresses the Renovations**

15.     The parties negotiated the Seventh (7th) Amendment to Office Lease (the "Seventh Amendment"), which was executed on August 6, 2014.   Ex. 7.  The Seventh Amendment was negotiated over the course of nine months by sophisticated parties, and USAC was actively represented throughout by its General Counsel and outside counsel.

16.     Through the Seventh Amendment, the parties amended Section 12 of the Lease to specifically address Landlord's expected renovations, stating in relevant part:

> Landlord has advised Tenant that Landlord intends to perform a renovation of the Building which will result in modifications to the Building, including without limitation, improved common areas and operating systems, additional floors, and a rooftop terrace for the Building (the "Renovation").

Ex. 7 § 10(g)

17.     The Seventh Amendment also amended Section 30 of the Lease, under the heading "CERTAIN RIGHTS RESERVED TO LANDLORD" which, in the original Lease, already gave Landlord broad rights to enter Tenant's Premises for the purpose of conducting renovations, stating in relevant part:

> Landlord shall have the following rights, exercisable without notice, without liability for damage or injury to property, person or business and without effecting an eviction, constructive or actual, or disturbance of Tenant's use or possession of the Premises or giving rise to any claim for set-off, abatement of Rent or otherwise:
>
> . . . (D.) To decorate and make repairs, alterations, additions and improvements, whether structural or otherwise, *in, to and about the Building and any part thereof*, and for such purposes to enter the Premises and, during the continuance of any such work, to close temporarily doors, entry ways, Common Areas in the Building and to interrupt or temporarily suspend Building services and facilities, all without affecting Tenant's obligations hereunder, as long as the Premises remain tenantable for the conduct of Tenant's business therein and Tenant shall have reasonable access to the Premises.

Ex. 7 § 10(r) (emphasis added).

18.     With knowledge that a major renovation was being planned by Landlord, the parties in the Seventh Amendment supplemented the broad renovation rights already provided in Section 30 of the Lease to provide:

> It is understood and agreed that the work permitted by Landlord under this Section 30 includes, without limitation, work relating to the Building exterior façade, windows, columns and other structural components, systems and common areas, and may include the elimination or shutting off of light, air or view, as well as noise in connection with any such work. *Provided that Tenant does not interfere with any such work*, Landlord shall use commercially reasonable efforts to minimize interference with Tenant's normal business operations in the Premises in connection with the exercise of any rights by Landlord under this

4

> Section 30, and such exercise shall in no way affect the Lease or impose any
> liability on Landlord.

Ex. 7 § 10(r) (emphasis added).

19.     Sections 12 and 30, as amended by the Seventh Amendment, reflect Tenant's awareness

and acknowledgement of Landlord's right to engage in renovations.  Tenant not only knew but

expressly permitted Landlord to engage in extensive work that would include, without limitation,

a new façade.  And Tenant not only was aware but expressly acknowledged that the work would

be disruptive -- including noisy work and the cutting off of light and air -- and that the Lease

would remain in effect throughout the renovations.

20.     The Lease, including the Seventh Amendment, by its express language also makes clear

that Tenant granted Landlord the right to enter the Premises not only to make structural

renovations to the Building or any part thereof (which includes the Premises), but also to erect

facilities *through* the Premises and to occupy portions of the Premises during the renovations.

21.     For example, the parties left undisturbed Section 11 of the Lease, under the heading

"LANDLORD'S ACCESS TO PREMISES," which provides:

> Upon such notice as is reasonable under the circumstances, which notice may be
> given orally, and which notice shall not be required in the event of an emergency,
> Landlord may at any reasonable time enter the Premises to examine them, to
> make alterations or repairs thereto or for any other purposes which Landlord
> considers necessary or advisable. . . . Landlord reserves the right and *shall be
> permitted reasonable access to the Premises to install facilities within and
> through the Premises* and to install and service any systems deemed advisable by
> Landlord to provide services or utilities to any tenant of the Building.

Ex. A § 11 (emphasis added).

22.     In the Seventh Amendment, in contemplation of the major renovation contemplated by

the parties, Tenant expressly acknowledged Landlord's right to store construction equipment and

materials in the Premises while the work was ongoing in any portion of the Premises,

demonstrating Tenant's awareness that Landlord would be conducting renovations in the Premises. The Seventh Amendment states, in part "all items brought into the Premises shall be removed prior to the start of the next business day *(unless such items are required for support on a temporary basis, and except in any event for the storage of construction equipment in the Premises solely during the period in which the work associated with such Renovation is occurring in any portion of the Premises*)."  Ex.7 § 10(g)(iv) (emphasis added).

23.    Tenant's right of quiet enjoyment, including its right to quietly occupy and enjoy the Premises, is subject to these provisions of the Lease.  Ex. A § 27.

**Tenant Extracted Material Concessions from Landlord under the Seventh Amendment**

24.    In negotiating the Seventh Amendment and in anticipation of the major renovation envisioned by Landlord, Tenant sought accommodations, fully aware that the renovations could be noisy and disruptive.

25.    For example, the parties also amended Section 12 of the Lease to provide:

> Notwithstanding anything contained in this Lease to the contrary, Landlord (a) shall use commercially reasonable efforts to conduct all components of such Renovation work and any other work performed by Landlord during the Term (collectively, "Landlord Work") that are particularly noisy (including, without limitation, core drilling and work requiring continuous pounding) outside of the hours of 8:00 AM to 6:00 PM, Mondays through Fridays; (b) shall use commercially reasonable efforts in connection with the Landlord Work not to interfere in any material respect with Tenant's use of the Premises; (c) shall perform the Landlord Work so that the level of Building services shall not decrease in any material respect from the level required of Landlord in this Lease as a result thereof; (d) shall perform the Landlord Work so that Tenant is not deprived of reasonable access to the Premises; and (e) shall perform the Landlord Work so that all items brought into the Premises shall be removed prior to the start of the next business day (unless such items are required for support on a temporary basis, and except in any event for the storage of construction equipment in the Premises solely during the period in which the work associated with such Renovation is occurring in any portion of the Premises).

Ex. 7 § 10(g)

26.     The parties also specifically negotiated for a remedy in the event that Landlord's work did end up materially impacting Tenant's use of the Premises.

27.     During the extensive negotiations, Tenant originally sought full abatement of rent during the renovations, but ultimately agreed that if there was a material and negative interference with Tenant's use of and/or access to the Premises for three or more consecutive business days after Tenant gave detailed written notice, then Tenant could be entitled to partial abatement as its "sole and exclusive remedy."  Ex. 7 § 10(g)(iv)

28.     This exclusive remedy of partial rent abatement would apply with respect to the portion of the Premises (or the entire Premises, if applicable) to which there was a material and negative interference with Tenant's use of and/or access to the Premises for three or more consecutive business days after notice.  Ex. 7 § 10(g)(iv).

29.     Specifically, and in relevant part, the parties agreed in the Seventh Amendment to modify Section 12 of the Lease, which expressly contemplates Landlord's renovations, to provide:

> Further notwithstanding anything contained in clauses (a) through (e) herein to the contrary, in the event that the Landlord Work materially and negatively interferes with Tenant's use of and/or access to, the Premises, for three (3) or more consecutive business days after Tenant gives Landlord written notice detailing with reasonable specificity the aspects of such material negative interference, Tenant shall be entitled, as its sole and exclusive remedy, to an abatement of the Base Rent, Tenant's Share of Increased Operating Expenses and Tenant's Share of Increased Real Estate Tax Expenses with respect to the portion of the Premises (or the entire Premises, if applicable) to which such material negative interference applies for the period beginning on the day after such three (3) business day period ends and continuing until the date on which such material negative interference detailed in Tenant's notice has ended.

Ex. 7 § 10(g)(iv).

30.     Landlord, through the Seventh Amendment, also allowed Tenant to consolidate its operations on the Third Floor, which at the time were scattered throughout office space on the Second Floor, Sixth Floor, Seventh Floor and Eighth Floor of the Building. Tenant also

negotiated to have Landlord build out the entire Third Floor for Tenant's use and benefit, and supply new office furniture.

31.     The concessions negotiated by Tenant cost Landlord approximately $5 million.

### Landlord Provides Tenant with a Renovation Impact Plan

32.     On or about April 30, 2015, following extensive planning with its architects and construction team, Landlord met with Tenant to share a Tenant Impact Plan that was specifically tailored to USAC. Landlord described in detail the renovations, the schedule for the renovations, and how the renovations would affect Tenant's Premises.

33.     Landlord's work, as contemplated by the Seventh Amendment, will turn Class B office space and antiquated systems into a vastly improved and tenant-friendly building.   The renovation plans contemplate, among other improvements and alterations, a connection to the adjoining building, a new two-story lobby, a glass curtain wall façade, four new floors, a two-story atrium, a rooftop conference center with terrace, a new fitness center and significantly upgraded systems and facilities.   Structural improvements to the building will include a new shear wall structural system, reinforced columns and expanded footings.

34.     Landlord and its architects designed the renovation schedule to minimize the renovation's impact on USAC and the other tenants in the Building.  For example, consistent with Section 12 of the Lease, particularly noisy work (including without limitation core drilling and work requiring continuous pounding) was scheduled to take place outside of the hours of 8:00 AM to 6:00 PM, Mondays through Fridays.  The renovation also was planned in stages to allow for the shoring up of the Building before the other renovations could take place. Furthermore, the renovations were phased to minimize disruption of Services, including elevator service and access to restroom facilities.

35.     In the April 30, 2015 meeting, Tenant expressed concern about the impact of the renovations and, in particular, partitions that would go up in Tenant's perimeter offices in connection with Landlord's exterior façade work.

36.     Landlord expressed its commitment to provide accommodations to Tenant, and in particular, to provide Tenant with "swing space" in the Building to replace the offices temporarily impacted by the renovations.

37.     Despite Landlord's expressed commitment to work with Tenant, Tenant's outside counsel sent a letter to Landlord on June 5, 2015 threatening legal action and to deny Landlord access to the Premises to prevent Landlord from proceeding with the renovations.

38.     If one phase of the schedule is delayed, it will disrupt the entire renovation sequence.

39.     Landlord, through counsel, responded on June 19, 2015 and expressed Landlord's continued desire to "engage in discussions on commercially reasonable accommodations to reduce the impact on [Tenant]."

**Landlord Devotes Significant Time and Resources to
Address Tenant's Concerns about the Renovations**

40.     Notwithstanding that the Lease already permitted Landlord to perform its renovations, Landlord met with Tenant on June 30, 2015 to seek a business resolution to the dispute over the renovations.

41.     At that meeting, Tenant informed Landlord that it wanted to terminate the Lease early and vacate the Premises.  Tenant also represented that it would be prepared to vacate within one year (that is, by July 2016).

42.     Landlord offered to accommodate Tenant by releasing Tenant from the Lease without penalty.

43.     The terms of the Lease provide that Tenant's lease of the premises expires on November 30, 2020, with a right to terminate the Lease effective September 30, 2017.  Thus, the value of Landlord's offer of early release without penalty is approximately $ $8.5 million to $15 million in Tenant's favor.

44.     Landlord also offered to construct swing space in the Building for Tenant at Landlord's expense, and agreed to evaluate USAC's request to move entire USAC "teams" into swing space (as opposed to just the individuals occupying the offices impacted by the work) and to build temporary restrooms for Tenant's use during its remaining twelve months in the Building.

**The Swing Space Plans are Developed with Tenant's Cooperation and Input**

45.     At its own expense, Landlord engaged its architects to work with Tenant to design swing space that met Tenant's expressed concerns during the renovations, including Tenant's need to swing entire teams as a unit and for additional bathrooms.  Tenant's desire to swing teams as a unit will result in Landlord providing Tenant with an additional 110 workstations throughout the course of the renovation to relocate employees whose workspace will not be impacted by the renovation.

46.     Landlord also hired an Information Technology ("IT") specialist to coordinate Tenant's IT needs during the renovations.

47.     Tenant provided input on every aspect of the swing space plans, including providing specific office and workstation assignments for each employee who was to be relocated.

48.     Landlord shared the swing space plans with Tenant on July 23, 2015.

49.     On August 10, 2015, Tenant expressed some trivial concerns about the details of the swing space plans (e.g., complaining that several offices in the swing space would have to share

one HVAC control as opposed to having individual office controls), even though Tenant's representatives provided input into every aspect of those plans.

50.     Reflecting the impact of swinging entire teams developed by Landlord and its architect, in consultation with Tenant's representatives, the swing space plan contemplates Landlord building out and furnishing, at its expense, 36 exterior offices and 69 interior workstations during the first phase of the renovation (referred to as "Drop 0"), when Landlord would be doing core structural work to support additional floors and other components of the Building.  During this phase of the renovation, only 14 exterior offices in the premises occupied by Tenant will have partition walls erected in connection with the renovation, and none of the workstations in the Premises will be directly impacted.

51.     The swing space plans also included a new set of restrooms, solely for the purpose of temporarily accommodating Tenant's employees during the renovation.

52.     Thus, in an attempt to reasonably accommodate Tenant during the period it was envisioned it would remain in the Building, Landlord was prepared to build out and furnish space for more offices than would be affected, and to pay to move entire teams of USAC personnel to facilitate what Tenant said was necessary for its use of the Premises.

53.     In another attempt to reach a commercially reasonable accommodation with Tenant, Landlord provided Tenant with a draft Ninth Amendment to the Lease on August 12, 2015.

54.     The draft Ninth Amendment addressed each of the items discussed between the parties at the June 30, 2015 meeting, which Landlord had been led to believe would satisfy Tenant's concerns, following Tenant's announcement that it preferred to vacate instead of remain throughout the term of the Lease as contemplated by the Seventh Amendment.

55.     In the draft Ninth Amendment, Landlord again offered to Tenant, among other things, the right to terminate the Lease early without penalty and to construct and relocate Tenant to the swing space at Landlord's expense in accordance with swing space plans which had been prepared collaboratively.

56.     Landlord's estimated cost to construct the swing space exceeds $500,000.

57.     To date, Landlord has incurred over $100,000 in fees and other costs to architects and IT professionals to meet with Tenant and prepare and revise swing space plans for Tenant.

58.     Despite Landlord's best efforts to accommodate Tenant, Tenant continued to threaten that it would obstruct Landlord's access to the Premises and interfere with the renovations.

**Tenant Reneges and Makes Additional Demands for
Free Space and Control of the Renovation**

59.     Notwithstanding Landlord's commercially reasonable accommodations to address Tenant's concerns and Landlord's steadfast efforts to reach an agreement before the renovations were set to commence in October 2015, Tenant continued to act unreasonably and in bad faith.

60.     On August 25, 2015, Tenant responded to the draft Ninth Amendment with a markup that ignored the parties' prior negotiations and demanded new and additional terms the parties had never discussed.

61.     In addition to Landlord's offer to construct swing space (not just for impacted offices but for entire teams) and to allow for early termination of the Lease, with no penalty, Tenant now wanted: (1) control over details of the renovations; (2) full rent abatement for up to two years while Tenant continued to occupy the Premises and look for new space;   (3) the ability to unilaterally stop the renovations if Tenant believed them to be too disruptive; and (4) Landlord to

return Tenant's entire security deposit upon execution of the Ninth Amendment, rather than following the termination of the Lease.

62.     On September 18, 2015, the parties met again to discuss a resolution.

63.     At the meeting, Tenant told Landlord for the first time that Tenant was less than a week away from signing a lease for a different rental space in Washington, D.C.

64.     Landlord informed Tenant that Tenant's new terms were commercially unreasonable, but Landlord would still be willing to move forward with the accommodations the parties had been discussing since June, namely to construct the swing space and temporary restrooms, and allow Tenant to terminate the Lease early and without penalty.

65.     Landlord also advised that if Tenant continued to demand unreasonable terms, Landlord was prepared to proceed under the existing terms of the Lease.

66.     Landlord reminded Tenant that the renovations would be commencing soon, and that if Tenant was genuinely interested in taking advantage of the swing space Landlord was offering as an accommodation, it would need to move quickly to reach an agreement, because Landlord needed time to complete the build-out and related work to move USAC's personnel.

67.     Landlord confirmed that it would not agree to give Tenant control over the renovations, and would not provide full abatement while also allowing Tenant to terminate the Lease early without penalty.

68.     The September 18, 2015 meeting ended with Landlord asking Tenant to reconsider its demands, or to proceed under the existing terms of the Lease.

69.      The parties did not enter into the Ninth Amendment.

**Renovations Commence and Tenant Confirms it will not Honor the Lease**

70.     On October 14, 2015, Landlord sent a letter to Tenant reconfirming Landlord's intent to enter the Premises on October 21, 2015 "in connection with the renovations contemplated by the Lease (and presented to USAC in April)."

71.     As part of "Drop 0", Landlord planned to construct a temporary partition in a workroom behind which Landlord would conduct structural work relating to the renovations.

72.     In its October 14, 2015 notice, Landlord offered to provide Tenant with an alternate workroom even though Tenant had previously indicated that the temporary partition would not impede its use of the workroom space (and, as such, had previously declined alternate workroom space).

73.     In response to Landlord's notice, on the evening that the work was set to commence, Tenant sent a draft "Letter Agreement" that did not reflect any of the parties' prior discussions and went well beyond anything the Parties had ever discussed.

74.     Tenant demanded more commercially unreasonable accommodations, including: control over every detail of renovation work; the payment of monetary sanctions up to $100,000 each time the Landlord engaged in work during business hours that Tenant deemed to be "loud;" and unreasonable cure periods of thirty minutes in the event Landlord performed such "loud" work.

75.     Tenant also demanded that, in exchange for acknowledging Landlord's right to perform the work in the workroom (and that work only), Tenant had the right to terminate the Lease early at no penalty and to occupy the Premises rent free until the date on which Tenant terminated the Lease.

14

76.     Tenant's draft "Letter Agreement" also required that Landlord obtain Tenant's "permission" to conduct the renovations, even though Landlord does not need "permission" to conduct such renovations pursuant to the Lease.

77.     The draft Letter Agreement made clear to Landlord that Tenant was not genuinely interested in a commercially reasonable solution and, as such, the Parties were left to their respective rights under the Lease (including Landlord's renovation rights and Tenant's sole and exclusive remedy of partial abatement).

78.     Consistent with its rights under the Seventh Amendment and consistent with the notices provided to Tenant on October 14, 2015, Landlord entered the premises on October 21, 2015, during non-business hours, and constructed a temporary wall in the workroom.

79.     The structural work for which Landlord entered the Premises on October 21, 2015 is necessary to shore up the building to accommodate the planned renovations.  If this work is delayed, it will disrupt the entire renovation schedule.  And if Tenant succeeds in preventing Landlord for conducting this work as part of Drop 0,  it will prevent Landlord from completing the renovations.

80.     On October 23, 2015, Tenant sent a letter purporting to be a notice of default to Landlord claiming that Landlord's October 21, 2015 access of the Premises was a "deliberate and material breach by Landlord under the Lease."

81.     On October 27, 2015, Landlord responded by letter rejecting the notice of default and demanding that it be withdrawn.

82.     That same day, Tenant's counsel informed Landlord's counsel that Tenant had filed a lawsuit against Landlord, thus confirming Tenant's intent to deny Landlord's access to the Premises and otherwise interfere with Landlord's renovations.

83.     Since as early as June 5, 2015, Tenant has threatened, and continues to threaten to disrupt Landlord's planned renovations, despite Landlord's clear right to conduct the renovations pursuant to the Lease and, in particular the Seventh Amendment.

84.     On October 30, 2015, Landlord sent a Notice of Default to Tenant under Section 19(A)(2) of the Lease for failure to comply with Tenant's covenant or obligation not to interfere with Landlord's work, including without limitation, work relating to the Building exterior façade, windows, columns and other structural components, systems and common areas under Sections 11, 12 and 30 of the Lease.

### Landlord Will Suffer Material Harm if Tenant Prevents Landlord's Access to the Premises or Otherwise Obstructs the Renovations

85.     Tenant's refusal to honor the terms of the Lease threatens real and material harm to Landlord, including financial damages, market harm, and reputational injury.

86.     During its 40 years in the real estate development business, Landlord has built a strong reputation of completing its projects on time.

87.     Landlord already has distributed marketing materials to the brokerage community to advertise early 2018 as the opening of the newly renovated Building.  If Landlord fails to complete this project on time, it will lose credibility with brokers, potential tenants and lenders. This loss of reputation will not only harm this project, but has the potential of harming all of Landlord's current and future projects.

88.     The injury to Landlord caused by Tenant's refusal to honor the Lease is being inflicted presently, and will only increase the longer Tenant succeeds in frustrating Landlord's efforts to move forward with the renovations.

89.     Currently Landlord is in various stages of lease discussions with potential tenants for delivery in early 2018 after the renovation is complete. A project delay will jeopardize these

negotiations since the potential tenants must commit to lease space several years before they intend to occupy such space.

90.     Contracts between the construction general contractor and subcontractors specify a period of time for work to be completed.  Subcontractors accept and price jobs based on the availability of their workers at any given time. If there is a delay in the renovation, Landlord will sustain financial injury.  Some subcontractors likely will increase their prices for the new time slot. Some subcontractors may not be able to provide their services at the new later date, which would require Landlord to negotiate contracts with new subcontractors, increasing transaction costs and inviting further delay and increased construction expense.

91.     Due to the high volume of construction in Washington, DC, construction labor costs have risen significantly in the last 12 months.  Having to negotiate new contracts with subcontractors in this environment would lead to significant extra cost.

92.     Failure to complete the renovations on time also will undermine lenders' confidence in Landlord for the current renovations and future projects, which will increase borrowing costs and impair Landlord's ability to obtain financing.

93.     These harms are in addition to the more than $100,000 that Landlord already has spent to design swing space for USAC, based on USAC's representation that it was acting in good faith and would work with Landlord to find commercially reasonable accommodations before it vacated prior to the end of the Lease term.

## CAUSES OF ACTION

### Count One: Declaratory Relief

94.     Each of the factual allegations stated in paragraphs 1 through 93 above is incorporated as if fully stated herein.

95.     The Lease, as amended by the Seventh Amendment, gives Landlord the right to enter the Premises to conduct the renovations.

96.     Tenant has threatened to interfere with and otherwise prevent Landlord from proceeding with its renovations in violation of the Lease and the Seventh Amendment.

97.     Tenant has taken steps to make good on these threats to frustrate and delay the renovations, including filing a lawsuit in a court without jurisdiction seeking relief to which Tenant is not entitled under the Lease.

98.     As such, an actual justiciable case or controversy exists between the parties with regard to whether Landlord has the right to enter the Premises to conduct the renovations and or whether Tenant is in breach of the Lease if it interferes with and otherwise prevents Landlord from proceeding with its renovations.

99.     Accordingly, Landlord requests that the Court issue judgment in its favor, stating and declaring, pursuant to D.C. Superior Court Rule 57 and 28 U.S.C. § 2201, that (i) Landlord has the right to access the Premises to conduct the renovations without interference by Tenant; and (ii) Tenant's sole and exclusive remedy for any material and negative interference with Tenant's use of and/or access to the Premises for three (3) or more consecutive business days after Tenant gives written detailed Notice is partial abatement of Rent under Section 12 of the Lease.

100.    Declaratory relief is available under D.C. Code § 44-607.

## Count Two: Declaratory and Injunctive Relief

101.    Each of the factual allegations stated in paragraphs 1 through 93 above is incorporated as if fully stated herein.

102.    Because Tenant's actions are contrary to law and may cause irreparable and continuing injury to Landlord, Landlord is entitled to declaratory and injunctive relief.

103.    Tenant's interference with Landlord's renovations of the Premises is in violation of the Lease, including without limitation the provisions expressly contemplating and permitting Landlord's renovations.

104.    Landlord has already incurred substantial costs in excess of $20 million in preparation for the renovations of the Building.

105.    In the absence of injunctive relief enjoining Tenant from denying Landlord access to the Premises to conduct the renovations, Landlord will suffer irreparable injury, including reputational and market harm.

106.    Injunctive relief is necessary for Landlord to begin and complete renovations without sustaining the irreparable harm threatened by Tenant.

107.    There is a substantial likelihood that Landlord will succeed on the merits of this Complaint.

108.    Tenant will not sustain injury for which monetary relief is unavailable if the injunction is granted because the Seventh Amendment provides a remedy in the form of rent abatement, and because Landlord already has offered reasonable commercial accommodations to preserve for Tenant the benefit of its use of the Premises while the renovations take place.

109.    Furthermore, the "harm" caused by any disruption attendant to Landlord's renovations was contemplated by the parties to the Lease, and already has been the subject of financial consideration from Landlord to Tenant of approximately $5 million.

110.    By contrast, Tenant threatens to deprive Landlord of the benefit not only of the express language of the Lease, but also of its financial and investment interests in the Building, which also will negatively impact the interests of other tenants and the benefits the District of Columbia

will secure from the continued revitalization of commercial office space in its central business district.

111.    The balance of interests tilts heavily in favor of Landlord.

112.    Injunctive relief is available under D.C. Code § 6-1407.

## Count Three: Attorneys' Fees

113.    Each of the factual allegations stated in paragraphs 1 through 93 above is incorporated as if fully stated herein.

114.    Section 19 of the Original Lease, as amended by the Seventh Amendment, provides that

> In the event either Landlord or Tenant shall employ an attorney to enforce the other party's covenants and obligations under this Lease, the non-prevailing party shall be liable for all reasonable costs and expenses sustained by the prevailing party in the enforcement of such covenants and obligations, including but not limited to reasonable attorneys' fees and expenses, costs of collection and court costs, up to a maximum of Two Hundred and Fifty Thousand Dollars ($250,000) for any such enforcement action.

Ex. 7 § 19(l)(vii).

115.    Plaintiff has been forced to employ legal counsel to enforce rights under the Lease.

116.    Pursuant to the Lease, Plaintiff is entitled to reasonable attorneys' fees from Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court:

1.    Enter an order stating and declaring that (i) Landlord has the right to access the Premises to conduct the renovations without interference by Tenant; and (ii) Tenant's sole and exclusive remedy for any material and negative interference with Tenant's use of and/or access to the Premises for three (3) or more consecutive business days after Tenant gives written detailed Notice is partial abatement of Rent under Section 12 of the Lease;

2.      Enter an order enjoining Tenant from denying Landlord access to the Premises to conduct the renovations and otherwise interfering with the renovations;

3.      Enter an order directing Tenant to pay any and all reimbursements to Landlord for reasonable Attorneys' Fees permitted under the Lease; and

4.      Grant such other relief that the Court may deem appropriate.

                                        Respectfully Submitted,


                                         __/s/ Anthony F. Cavanaugh_____
                                        WILLIAM BOSCH (DC Bar No. 444247)
                                        ANTHONY CAVANAUGH (DC Bar No. 482760)
                                        Arnold & Porter LLP
                                        601 Massachusetts Ave., NW
                                        Washington, DC 20001-3743
                                        Telephone: 202-942-5501
                                        Facsimile: 202-942-5999

                                        *Attorneys for Plaintiffs*


Dated: October 30, 2015

**IN THE SUPERIOR COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| 2000 L OWNER, L.L.C., | |
| Plaintiff, | 2015 CA 008405 B<br>Judge Robert D. Okun |
| v. | |
| UNIVERSAL SERVICE<br>ADMINISTRATIVE COMPANY, | |
| Defendant. | |

**NOTICE OF FILING  -  NOTICE OF REMOVAL**

PLEASE TAKE NOTICE:

That on the 6th day of November, 2015, Defendant Universal Service

Administrative Company ("USAC") removed this civil action from this Court to the

United States District Court for the District of Columbia, pursuant to 28 U.S.C. §§

1441(b), 1446.  A copy of the Notice of Removal effecting that removal is appended

hereto.

Pursuant to 28 U.S.C. § 1446(d), the Superior Court for the District of Columbia

may not proceed further in this case.

Dated:  November 6, 2015          Respectfully submitted,

                                                 */s/ Donald B. Mitchell, Jr.*

Donald B. Mitchell, Jr. D.C. Bar No. 358751
Karen S. Vladeck, D.C. Bar No. 1000311
**ARENT FOX LLP**
1717 K Street, N.W.
Washington, DC  20006-5344
(202) 857-6000 – Telephone
(202) 857-6395 – Facsimile
Donald.Mitchell@arentfox.com
Karen.Vladeck@arentfox.com

*Attorneys for Defendant*
*Universal Service Administrative Company*

### CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of November 2015 a true and correct copy of the foregoing Notice of Filing - Notice of Removal was served via the Court's electronic filing system and by U.S. first class mail, postage prepaid, upon the following:

William Bosch, Esq.
Anthony Cavanaugh, Esq.
Arnold & Porter LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Attorneys for Plaintiff

/s/ Donald B. Mitchell, Jr.
Donald B. Mitchell, Jr.